**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

YSIDRO ALBERTO OROPEZA-WONG,
           *Petitioner,*

v.

ALBERTO R. GONZALES,* Attorney
General,

           *Respondent.*

No. 03-71446

Agency No.
A72-714-990

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
October 6, 2004—Seattle, Washington

Filed May 10, 2005

Before: Dorothy W. Nelson, Stephen Reinhardt, and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge D.W. Nelson

---

*Alberto R. Gonzales is substituted for his predecessor, John Ashcroft, as Attorney General of the United States, pursuant to Fed. R. App. P. 43(c)(2).

**COUNSEL**

Adolfo Ojeda-Casimiro, Salazar Law Offices, Seattle, Washington, for the petitioner.

Susan K. Houser, U.S. Department of Justice, Civil Division, Office of Immigration Litigation, Washington, D.C., for the respondent.

**OPINION**

D.W. NELSON, Senior Circuit Judge:

Ysidro Oropeza-Wong ("Oropeza"), a Mexican national, petitions for review of a decision of the Board of Immigration Appeals ("BIA") which (1) denied him a statutory waiver of the joint filing requirement for removal of the conditional basis of his permanent resident status on the ground that he entered into his marriage to U.S. citizen Melissa Renteria[1] in bad faith, 8 U.S.C. § 1186a(c)(4)(B), (2) ordered him removed on the basis of marriage fraud, 8 U.S.C. § 1227(a)(1)(G)(i), and (3) denied his request for voluntary departure, 8 U.S.C. § 1229c.[2] Oropeza contends that he is entitled to have the conditional basis of his permanent resident status lifted because, although the marriage was dissolved within two years, he entered into it in good faith. He offers no separate argument with respect to the order of removal, but asserts that it was an abuse of discretion to deny him voluntary departure. The government contends that we do not have jurisdiction to entertain Oropeza's claims. We conclude that while we lack jurisdiction over Oropeza's voluntary departure claim, we retain jurisdiction over his challenge to the order of removal and to his underlying claim that, because his marriage was entered into in good faith, he is entitled to a statutory waiver that would result in his receiving permanent resident status. We further conclude, however, that the BIA's rejection of that underlying claim is supported by substantial evidence. We therefore dismiss the petition in part and deny it in part.

---

[1]Although Renteria took her husband's name after the marriage, we refer to her as "Renteria" throughout to distinguish her from her now former husband, Oropeza.

[2]All subsequent references to code sections are to Title 8 unless specifically noted.

### *I. Factual and Procedural Background*

Oropeza met Renteria in January 1993 when both worked at the same company. He testified that after dating for about one year, the two were married in a civil ceremony in Mount Vernon, Washington, on April 14, 1994. According to Oropeza, following their marriage, he and Renteria lived with her family until November 1994, when they were able to move into an apartment of their own. He added that in January 1995 he left Washington to take a temporary job in Alaska, where he spent three to five weeks. Oropeza stated that in May 1995, he confronted Renteria with his suspicion that she was being unfaithful to him, and that, after Renteria suggested they divorce, the two separated in June 1995. The marriage ended in divorce on November 27, 1995, nineteen months after it began.

The INS granted Oropeza conditional permanent resident status on September 15, 1994, and terminated that status on September 15, 1996. On August 16, 1996, Oropeza filed a Petition to Remove the Conditions on Residence (hereinafter "Form I-751") with the INS. Because, under the statute, an alien is not permitted to file the requisite joint petition with an ex-spouse, Oropeza applied for a statutory waiver of the joint filing and interview requirements on the ground that his was a good faith marriage that had been terminated by divorce. *See* § 1186a(c)(4)(B). Oropeza's application was denied on June 3, 1998. On June 10, 1998, he was served with a Notice to Appear, stating that his conditional resident status had been terminated and charging him with being subject to removal for marriage fraud under § 1227(a)(1)(G)(i).

At his removal hearing, Oropeza sought review of the denial of his statutory waiver and a determination that he was entitled to permanent resident status and was therefore not removable. He was the sole witness to testify. The government presented no witnesses. In addition to testifying, Oropeza provided documentary support to show that he

entered his marriage in good faith, including: a jointly filed tax return; a lease for an apartment dated November 1994; eight canceled checks from a joint account; telephone bills listing Oropeza and Renteria as residing at the same address; an application for life insurance; and an application for vehicle title. Some of these documents were unsigned by Oropeza and Renteria, including the lease; there was no evidence that others, such as the applications for life insurance or automobile title, had been filed. Oropeza also provided a letter from a nurse who had treated him over an extended period of time stating that his wife had accompanied him on most office visits, as well as letters that Renteria had written to him during periods of separation.

The hearing also addressed aspects of Oropeza's life before and after his marriage to Renteria that raised questions as to his credibility, including his failure to list his children on forms filed with the INS or to mention them in an interview with immigration officials, and his relationship with his current wife, Edith Solis ("Solis"). Prior to his marriage to Renteria, Oropeza fathered two children in Mexico: Imelda, born in 1984, and Alberto, born to Oropeza and Solis in 1987. The government questioned Oropeza about the failure to list his children both on the petition that Renteria filed on his behalf and on the first Form I-751 that he, himself, filed. Oropeza stated that Renteria knew about his children but chose not to list them and that the attorneys who had filled out his I-751 had omitted the children due to an error. Oropeza also testified that he did not mention his children during his interview with the INS examiner because he thought that they were not relevant to the immigration decision as they were not U.S. citizens.

The Immigration Judge ("IJ") also questioned Oropeza about INS records of a 1989 detention in Anchorage, Alaska, prior to his marriage to Renteria, focusing on the statements on the forms that indicated that Solis, whom Oropeza was apprehended with, was his wife. Oropeza responded that he

was not married to Solis at the time, and that, although Solis would sometimes refer to him as her "husband," she was his "girlfriend." After his separation from Renteria, Oropeza returned to Mexico and resumed a relationship with Solis. They underwent a marriage ceremony in Alaska on April 4, 1997.

In a written opinion, the IJ found that Oropeza was not a credible witness because of his failure to list his children on the INS forms and mention them during his interview, the inconsistencies in his testimony about Solis, and his demeanor during cross-examination. The IJ also stated that Oropeza's decision to return to Mexico after his divorce to seek out Solis suggested that "respondent appeared to have married Melissa [Renteria] solely for his papers and then he was going to return to Edith Solis." The IJ commented on Oropeza's departure for Alaska within eight months of his marriage to Renteria, and on the lack of any corroborating testimony about the *bona fides* of the marriage by family or friends. She concluded that the marriage had not been entered into in good faith and denied Oropeza the statutory waiver. She further found that the INS had established Oropeza's removability for marriage fraud by "clear, convincing, and unequivocal evidence" and denied his request for voluntary departure.

The BIA affirmed the IJ's decision in a written opinion dated March 5, 2003. The BIA found that the IJ's adverse credibility determination was supported by the record, relying specifically on the inconsistencies between Oropeza's 1989 statements to immigration officials about his marital status with Solis, his failure to disclose the existence of his children on both his first Form I-751 and during his interview with an INS official, and his inconsistent and weak testimony before the IJ.

In its evaluation of the *bona fides* of Oropeza and Renteria's marriage, the BIA emphasized Oropeza's failure to explain the context of the undated letters from Renteria, par-

ticularly given the brevity of the time that, according to Oropeza, he spent in Alaska. The BIA also noted that the documentation submitted at the hearing revealed three addresses for the couple during the course of their marriage, while Oropeza's testimony only mentioned two residences. The BIA concluded that the documentation did not establish that the couple "actually lived together or shared a life as husband and wife." Specifically, the BIA pointed to the facts that the lease agreement was unexecuted and that the cancelled checks did not include a rent payment.

The BIA stated that the evidence "consist[ed] mainly of incredible and meager testimony . . . [and] unexplained evidentiary gaps . . . ." It therefore concluded that Oropeza did not provide sufficient evidence to demonstrate that he entered his marriage in good faith and affirmed the denial of the statutory waiver and the order of removal for marriage fraud. The BIA also affirmed the IJ's decision not to grant Oropeza voluntary departure.

## II. Standard of Review

We review de novo the jurisdictional limitations of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA). *Barron v. Ashcroft*, 358 F.3d 674, 677 (9th Cir. 2004). Where the BIA conducts a de novo review and issues its own decision, we review the BIA's decision and not that of the IJ. *Sanchez-Cruz v. INS*, 255 F.3d 775, 779 (9th Cir. 2001). We review the BIA's legal conclusions de novo and its factual determinations for substantial evidence. *Hamoui v. Ashcroft*, 389 F.3d 821, 826 (9th Cir. 2004).

## III. Discussion

### A. Jurisdiction

[1] The parties disagree on two basic threshold jurisdictional questions. The first is easily answered: Do we have

jurisdiction over Oropeza's voluntary departure claim? We do not. § 1229c(f) ("No court shall have jurisdiction over an appeal from denial of a request for an order of voluntary departure . . . ."); *see Tovar-Landin v. Ashcroft*, 361 F.3d 1164, 1166 (9th Cir. 2004). Accordingly, we do not review the BIA's decision to deny voluntary departure.

**[2]** The other jurisdictional question is not as simple, as this circuit has not yet considered the question: May we review a decision of the BIA denying a statutory waiver under § 1186a(c)(4)(B)? The government contends that § 1252(a)(2)(B)(ii), which precludes judicial review of "any . . . decision or action of the Attorney General the authority for which is specified . . . to be in the discretion of the Attorney General," applies to the BIA's decision to deny Oropeza a statutory waiver because § 1186a(c)(4) contains two references to the Attorney General's discretion.[3] First, the government argues

---

[3]The full text of § 1186a(c)(4) provides:

The Attorney General, in the Attorney General's discretion, may remove the conditional basis of the permanent resident status for an alien who fails to meet the requirements of paragraph (1) [for joint filing] if the alien demonstrates that —

    (A)   extreme hardship would result if such alien is removed,

    (B)   the qualifying marriage was entered into in good faith by the alien spouse, but the qualifying marriage has been terminated (other than through the death of the spouse) and the alien was not at fault in failing to meet the requirements of paragraph (1) [for joint filing], or

    (C)   the qualifying marriage was entered into in good faith by the alien spouse and during the marriage the alien spouse or child was battered by or was the subject of extreme cruelty perpetrated by his or her spouse or citizen or permanent resident parent and the alien was not at fault in failing to meet the requirements of paragraph (1) [for joint filing].

In determining extreme hardship, the Attorney General shall consider circumstances occurring only during the period that the

that the statement in the first sentence of § 1186a(c)(4) that "[t]he Attorney General, in the Attorney General's discretion, may remove the conditional basis . . . ." generally bars our exercise of jurisdiction over all claims of statutory waivers provided for by that section. Second, the government argues that the statement in the section's final paragraph that "[t]he determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General" specifically bars our review of all adverse credibility determinations made in connection with applications for such waivers.

**[3]** Because it is well established in this circuit that § 1252(a)(2)(B)(ii) "applies only to acts over which a statute gives the Attorney General pure discretion unguided by legal standards or statutory guidelines," our jurisdiction depends on the nature of the determinations the BIA makes under § 1186a(c)(4). *Medina-Morales v. Ashcroft*, 371 F.3d 520, 528 (9th Cir. 2004). For a statutory provision to strip this court of jurisdiction under § 1252(a)(2)(B)(ii), the provision must specify that "the right or power to act is entirely within [the Attorney General's] judgment or conscience." *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 690 (9th Cir. 2003). We hold that determinations made with respect to statutory waivers under § 1186a(c)(4) are not purely discretionary and are therefore generally subject to review. Furthermore, we hold that the statutory history of that section demonstrates

alien was admitted for permanent residence on a conditional basis. In acting on applications under this paragraph, the Attorney General shall consider any credible evidence relevant to the application. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General. The Attorney General shall, by regulation, establish measures to protect the confidentiality of information concerning any abused alien spouse or child, including information regarding the whereabouts of such spouse or child.

unequivocally that Congress did not intend to strip courts of jurisdiction to review adverse credibility determinations in particular.

[4] To understand the nature of the statutory waivers under § 1186a(c)(4), a brief introduction to the section as a whole is useful. Section 1186a governs the process by which an alien who marries a U.S. citizen obtains permanent residence status on a conditional basis by virtue of that marriage, and the procedures by which an alien may have the conditional basis of that status removed. Under this section, an alien may become a permanent resident after two years by jointly filing with the alien's citizen spouse a petition for removal of the conditional basis. § 1186a(c)(1). When (1) joint filing is no longer possible under the statute because of a judicial termination of the marriage, (2) such filing is impractical because the citizen-spouse is a domestic abuser, or (3) removal of the alien would create extreme hardship, the alien may seek a statutory waiver of the joint filing requirement. § 1186a(c)(4). The first two exceptions apply, however, only if the marriage was entered into in good faith. Because his marriage terminated in dissolution less than two years after it began, Oropeza requested such a waiver and contended that his was a good faith marriage.[4]

The government contends that the first sentence of the statute bars review of all determinations made under § 1186a(c)(4). Our decision is governed by our prior holdings: unless the disputed determination is purely discretionary— unless there are no questions of fact or law at issue—judicial review is not precluded. *See Spencer Enters.*, 345 F.3d at 690 (holding that under § 1252(a)(2)(B)(ii) we retain jurisdiction

---

[4]Although § 1186a(c)(4) is entitled "Hardship Waiver," only the first of the three subsections relates to a "hardship" that would result from removal. The others relate to good faith marriages ending in dissolution and to battered spouses, respectively. The three subsections provide entirely different grounds for excusing compliance with the requirement of § 1186a(c)(1) that the petition must be jointly signed and that the spouse of the applicant must appear for a personal interview.

to review determinations of the Attorney General unless the they are "pure[ly] discretion[ary]" or "entirely within his [ ] judgment"); *see also Hernandez v. Ashcroft*, 345 F.3d 824, 833-34 (9th Cir. 2003) (holding that a determination of whether an alien suffered "extreme cruelty" is a reviewable legal and factual determination).

**[5]** Petitions for statutory waivers under § 1186a(c)(4)(B) on the basis of a good faith marriage involve legal and factual questions that are not subject to the pure discretion of the IJ or BIA. *See Nakamoto v. Ashcroft*, 363 F.3d 874, 880 (9th Cir. 2004) (holding that marriage fraud involves reviewable legal and factual questions); *see also Damon v. Ashcroft*, 360 F.3d 1084, 1089 (9th Cir. 2004) (describing legal and factual issues involved in good faith marriage determinations). "[T]he Attorney General *cannot* legally make a judgment [about whether a petitioner's marriage was in good faith] solely according to the dictates of his or her conscience."[5] *Nakamoto*, 363 F.3d at 881. Thus, we are generally free to review BIA decisions that marriages were not entered into in good faith, and we retain jurisdiction to do so when such decisions constitute the basis for a denial of a statutory waiver under § 1186a(c)(4).[6]

---

[5]We recognize that two other circuits have reached a different result. *See Assaad v. Ashcroft*, 378 F.3d 471, 475 (5th Cir. 2004); *Urena-Tavarez v. Ashcroft*, 367 F.3d 154, 161 (3d Cir. 2004). However, for the reasons explained above, we disagree with the suggestion that all determinations under § 1186a(c)(4) are left to the Attorney General's "pure discretion." *Urena-Taverez*, 367 F.3d at 160. The statutory provision is manifestly to the contrary, requiring a variety of factual and legal determinations devoid of any need for subjective decisions.

[6]Further evidence that the first reference to the Attorney General's discretion does not eliminate our review of decisions under § 1186a(c)(4) is provided by all the other legal and factual determinations called for by this provision. For example, while the BIA based its denial on the lack of a good faith marriage, other § 1186a(c)(4)(B) determinations also involve questions of law or fact that would be reviewable under our precedent, such as whether the alien's marriage was "qualifying" or had been "termi-

The second statutory reference to the Attorney General's discretion relied on by the government provides the basis for its contention that courts are precluded from reviewing a particular aspect of the BIA's decisions under § 1186a(c)(4): adverse credibility determinations. Although credibility determinations are generally reviewable in immigration law, *see, e.g., Yeimane-Berhe v. Ashcroft*, 393 F.3d 907, 910 (9th Cir. 2004), the government points to language in the final paragraph of § 1186a(c)(4) stating that "the determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General." The statutory history of the section demonstrates beyond any question, however, that Congress adopted this language for the specific purpose of putting a stop to immigration officials' practice of employing overly-strict evidentiary rules when determining the credibility of battered women, and *not* in order to limit judicial review of credibility decisions.[7]

Congress enacted § 1186a as part of the Immigration Marriage Fraud Amendments of 1986. 99 Pub. L. No. 639, § 216(c)(D) (1986). Originally, this section set forth only two

---

nated" or whether the alien was legally "at fault" for failing to meet the joint filing requirement. While neither of the other two exceptions for hardship waivers, § 1186(c)(4)(A) and (C), is involved in this case, we note that those determinations, too, will usually require factual and legal determinations. *See, e.g.*, *Hernandez*, 345 F.3d at 833-35 (reviewing the factual and legal determinations underlying an "extreme cruelty" finding); *Montero-Martinez v. Ashcroft*, 277 F.3d 1137, 1144 (9th Cir. 2001) (reviewing a legal determination underlying an "extreme hardship" decision).

[7]The statutory history recounted here is well documented in the secondary literature. Two particularly good sources, incorporated into the discussion below, are Lesley E. Orloff & Janice v. Kaguyutan, *Offering a Helping Hand: Legal Protections for Battered Immigrant Women: A History of Legislative Responses*, 10 Am. U. J. Gender Soc. Pol'y & L. 95 (2001) and Sarah M. Wood, Note, *VAWA's Unfinished Business: The Immigrant Women Who Fall Through the Cracks*, 11 Duke J. of Gender L. & Pol'y 141 (2004).

grounds for obtaining a statutory waiver: (4)(A) (extreme hardship) and (4)(B) (good faith marriage). The amendments did not include (4)(C), the battered spouse provision, or the "credible evidence" language. While successful in deterring much immigration marriage fraud, § 1186a in its original form often had unforeseen consequences for battered women. As a result of the INS's interpretation of "extreme hardship," statutory waivers were denied to many women abused by their citizen or lawful permanent resident spouses. The INS's interpretation forced battered women "to remain in an abusive relationship for fear of deportation." H.R. Rep. No. 101-723(i) at 6731 (1990).

In response to the INS's interpretation, Congress, when adopting the Immigration Act of 1990, amended § 1186a to create a third, express ground for statutory waiver: spousal abuse. *See* § 1186a(c)(4)(C); Battered Spouse or Child Waiver of the Conditional Residence Requirement, 101 Pub. L. No. 649, § 701 (1990). However, despite Congress' ameliorative intent to "ensur[e] the safety and protect[ . . . ] the legal rights of immigrants in situations of domestic violence," H.R. Rep. No. 101-723(i) at 6731 (1990), the INS again interpreted the provision narrowly. In particular, the INS imposed onerous evidentiary requirements on battered women alleging spousal abuse. For example, under 8 C.F.R. § 216.5(e)(3)(iii) (1993), battered women were required to provide "experts" to corroborate their stories, and to offer "expert testimony in the form of reports and affidavits from police, judges, medical personnel, school officials, and social service agency personnel." To demonstrate extreme mental cruelty, the INS required "the evaluation of a professional recognized by the Service as an expert in the field." 8 C.F.R. § 216.5(e)(3)(iv) (1993). As Congress recognized, these stringent requirements were difficult for non-English speakers to meet. *See* H.R. Rep. No. 103-395, at 37-38 (1993). Consequently, few were able to benefit from the new exception.

**[6]** Congress became aware that the Immigration Act of 1990 had not succeeded in its objective of affording adequate protection to battered women and children and that the INS rarely found that victims of abuse met its standard for proving credible evidence of their battery. H.R. Rep. 103-395, at 26, 37-38. Therefore, in the Violence Against Women Act of 1994 (VAWA), subtitle G, entitled "Protections for Battered Immigrant Women and Children,"[8] Congress once again enacted a number of new provisions in a further effort to protect battered immigrant women and children. Specifically, Congress created new exceptions in the visa and suspension of deportation contexts for victims of spousal abuse— exceptions that freed victims from relying on battering spouses when seeking relief, much as Congress had initially attempted to do by means of § 1186a(c)(4)(C) in the statutory waiver context in 1990. *See* 101 Pub. L. No. 302, § 40701 (1994), 8 U.S.C. § 1154 (self petition provision) & 101 Pub L. No. 302, § 40703 (1994), 8 U.S.C. § 1254a (repealed 1997) (suspension of deportation). Congress also added an identical "credible evidence" provision to all the VAWA provisions of the subtitle, including § 1186a(c)(4), in order to make it *easier* for battered women to prove spousal abuse. 101 Pub. L. No. 302, § 40702. It sought to eliminate the requirement for expert or medical corroboration and directed the Attorney General to consider all credible evidence, not just evidence provided by experts:

> In acting on applications under this paragraph, the Attorney General shall consider any credible evidence relevant to the application. The determination of what evidence is credible and the weight to be

---

[8]VAWA was passed within the Violent Crime Control and Law Enforcement Act of 1994, 103 Pub. L. No. 322 (1994). The provisions relevant here are 103 Pub. L. No. 322, § 40701 (1994), 8 U.S.C. § 1154 (self-petition for visa provision); 103 Pub. L. No. 322, § 40702 (1994), 8 U.S.C. § 1186a(c)(4)(3) (hardship waiver provision); 103 Pub. L. No. 322, § 40703 (1994), 8 U.S.C. § 1254(a) (repealed 1997) (suspension of deportation provision).

given that evidence shall be within the sole discretion of the Attorney General.

*Id.* Ironically, the provision on which the government now relies to deprive aliens of the right to judicial review was intended by Congress to bolster, rather than weaken, the opportunities for battered women to obtain relief under immigration law. H.R. Rep. No. 103-395 at 38 (discussing intent to override existing regulation to aid battered women).

Congress' purpose—to require that immigration officials consider all of the available evidence and cease dismissing claims for lack of credible evidence whenever battered women had difficulty corroborating the facts of their abuse— is explicitly stated in the legislative history. For example, the House Report explained:

> Section 242 [Use of credible evidence in spousal waiver applications] sets forth the evidence standards to be applied in determining whether an alien or an alien's child had been battered or subject to extreme cruelty. This section allows an alien who makes an application for a battered spouse waiver under Section 216(c)(4) of the Immigration and Nationality Act to support that application with any credible evidence.
>
> . . . .
>
> Section 701 of the Immigration Act of 1990 amended the law to provide that one of the hardship waivers to this requirement is available to an alien who demonstrates that she was battered or was the subject of extreme cruelty perpetrated by the citizen or resident spouse. Current Immigration and Naturalization Service regulations require an application for a hardship waiver to be supported by an affidavit from a licensed mental health professional. This reg-

ulation focuses the inquiry on the effect of the cru-
elty on the victim rather than on the violent behavior
of the abuser, and it may be discriminatory against
non-English-speaking individuals who have limited
access to bilingual mental health professionals. This
section overrides this regulation by directing the
Attorney General to consider any credible evidence
submitted in support of hardship waivers based on
battering or extreme cruelty whether or not the evi-
dence is supported by an evaluation by a licensed
mental health professional.

H.R. Rep. No. 103-395, at 37-38. In short, the VAWA
amendments were intended to supercede the INS's restrictive
regulations regarding the admissibility of evidence and to
ensure that the INS did not commit similar errors with regard
to the new exceptions for self-petition visas or suspensions of
deportation, not to strip federal courts of jurisdiction to ensure
that battered women obtain the relief that Congress intended
to make available to them.[9]

---

[9]Additional evidence of Congress' intent regarding the "credible evi-
dence" provision is found in its enactment of the Battered Immigrant
Women Protection Act of 2000 (BIWPA). 106 Pub. L. No. 386 (2000).
Congress described BIWPA as a bill that "[s]trengthens and refines the
protections for battered immigrant women in the original Violence
Against Women Act." H.R. Conf. Rep. No. 106-939 (2000) at 110; *see
also id.* at 111-15. Two provisions of BIWPA—one amending the suspen-
sion of deportation provision of VAWA, and another creating a waiver for
aliens involved in domestic violence crimes who were acting in self-
defense—include the identical "credible evidence" provision that Con-
gress used three times in VAWA. 106 Pub. L. No. 386, §§ 1504, 1505
(2000).

Congress' use of the credible evidence provision twice in BIWPA,
given the context of the Act's overall reduction of evidentiary hurdles for
battered women, confirms its intent with respect to the use of this lan-
guage in the earlier legislation. For example, BIWPA reduced the eviden-
tiary burdens on battered women and children by (1) eliminating a
separate "extreme hardship" showing for successful visa petitions, (2)
reducing the evidentiary burden on proving that a battering husband had

Following the 1993 amendments, the INS appeared, at least initially, to recognize Congress' intention and to demonstrate a willingness to comply with it. In 1996, the INS adopted a regulation implementing VAWA's self-petition visa amendment and, in doing so, interpreted the credible evidence provision common to all of VAWA's amendments. 61 Fed. Reg. 13061 (1996) (interim rule). The agency's discussion of the new regulations suggested that it understood that the amendments were intended to provide considerable flexibility to petitioners, including allowing the INS to grant relief to victims of abuse, even though they could provide only unsupported affidavits when making a claim of battery, so long as the affidavits were credible. *Id.* at 13066; *see id.* at 13068-69 ("In accordance with the [self-petition provision of VAWA], this rule provides that the Service will consider all credible evidence submitted with the application before reaching a decision."). Nothing in the INS's interpretation suggested that, in relaxing the evidentiary rules, Congress had any additional motivation, let alone any motivation that would be inimical to the interests of battered women, such as stripping the courts of jurisdiction to review their claims. In fact, due in part to the credible evidence provision, VAWA's protections for battered aliens resulted in significant improvements. *See, e.g.*, Orloff & Kaguyutan, *supra* n.7 at 169-70 (describing benefits to battered immigrant women from legislative reforms). We see no reason now to reverse those recent advances and return to a period when battered women were viewed with suspicion and hostility and all too often were deprived of judicial protection. Instead, we construe the "credible evidence" provision precisely as Congress intended, as a further means of affording protection to abused immigrants.

---

not been previously married, (3) reducing the difficulty of showing that the abusing spouse was a U.S. citizen or lawful permanent resident, (4) creating exceptions to the "good moral character" showing, and (5) reducing the burden on proving that someone was a crime victim for qualification of a U Visa. *See id.* at §§ 1503(b), 1504(a), 1507, 1513.

**[7]** In short, the provision in § 1186a(c)(4) affording the Attorney General discretion over what constitutes credible evidence must be interpreted in-line with Congress's clear intent: as a requirement that immigration officials liberally admit evidence, not as a bar to judicial review. The result suggested here by the government runs contrary to Congress's efforts over the last fourteen years to ensure that in reaching critical immigration decisions, INS officials demonstrate greater sensitivity toward the plight of battered women. Depriving courts of power to enforce Congress' will by proscribing review of the decisions of INS officials would make little sense, given Congress' objective in adopting the provision at issue. As we explained when interpreting a different provision of VAWA concerning what constitutes "extreme cruelty" in the suspension of deportation context, it would be perverse to hold that measures intended to protect battered women serve instead to strip the courts of jurisdiction to protect their rights. *Hernandez*, 345 F.3d at 835 ("In light of Congress's desire to remedy the past insensitivity of the INS and other governmental entities to the dangers and dynamics of domestic violence, it appears quite unlikely that Congress would have intended to commit the determination of what constitutes domestic violence to the sole discretion of immigration judges.").

**[8]** Finally, although Congress created the credible evidence provision principally to aid battered women, it made its liberal evidence rule applicable to persons covered by all three subsections of § 1186a(c)(4), including those whose good faith marriages had been terminated by legal proceedings. In VAWA, Congress was explicit about where within the section the new rule should be codified, namely "after the second sentence" of § 1186a(c)(4) (1993). 103 Pub. L. No. 322, § 40702 (1994). This places the credible evidence provision in the middle of a separate paragraph following the three subsections. We know that this separate paragraph is not limited to the third subsection, (4)(C), covering battered women, because the first sentence of the paragraph discusses "extreme

hardship," a concept relevant only to the first category of petitioners, those covered by (4)(A). Therefore, the second reference to the Attorney General's discretion in § 1186a(c)(4) necessarily applies to all statutory waivers under § 1186a(c)(4), including those based on termination of a good faith marriage. No basis exists for construing the pertinent language differently with respect to any of those subsections. Thus, the second statutory statement regarding the Attorney General's discretion does not bar our review of claims involving credibility determinations in cases regarding statutory waivers under § 1186a(c)(4).

**[9]** There is one further jurisdictional question that neither of the parties addresses: whether we have jurisdiction over the order of removal. Because we are required to consider, sua sponte, all jurisdictional questions that may exist, we do so briefly now. *See Spencer Enters.,* 345 F.3d at 687. Here, as with the question of our jurisdiction over orders denying voluntary departure, the answer is clear, although this time the result is the opposite. We *do* have jurisdiction over removal orders for marriage fraud. In *Nakamoto v. Ashcroft*, we held that we have jurisdiction to review orders of removal under § 1227(a)(1)(G)(ii), the second sub-paragraph of the marriage fraud provision. 363 F.3d at 880-81. Oropeza's order of removal was issued pursuant to the first sub-paragraph of that provision, § 1227(a)(1)(G)(i). For jurisdictional purposes, the first and second sub-paragraphs are indistinguishable. Thus we have jurisdiction over orders of removal under § 1227(a)(1)(G)(i).

## B. Merits Analysis

Oropeza's primary contention is that he is entitled to a statutory waiver because he and Renteria entered into their marriage in good faith. Having determined that we have jurisdiction to review the BIA's order denying the waiver, we now consider whether substantial evidence supports that order. Under the substantial evidence standard that governs

our review of § 1186a(c)(4) waiver determinations, we must affirm the BIA's order when there is such relevant evidence as reasonable minds might accept as adequate to support it, even if it is possible to reach a contrary result on the basis of the evidence. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). We conclude that there was substantial evidence in the record to support the BIA's adverse credibility finding and its denial of the statutory waiver. We also deny review of the BIA's consequent affirmance of the IJ's removal order for marriage fraud.

### 1.  Adverse Credibility Determination

   **[10]** Adverse credibility determinations must be based on "specific, cogent reason[s]," which the BIA provided here. *See Alvarez-Santos v. INS*, 332 F.3d 1245, 1254 (9th Cir. 2003). The BIA's adverse credibility finding was based in part on Oropeza's failure to inform the INS about his children during his oral interview and on the pertinent INS forms. At the time Oropeza failed to disclose the existence of his children, he was not attempting to flee persecution and enter the country but was simply concealing material information related to a core element of his claim. *Cf. Akinamade v. INS*, 196 F.3d 951, 956 (9th Cir. 1999). Filing the form without listing his children from prior relationships, including one with Solis, enhanced Oropeza's claim that his marriage to Renteria was in good faith and therefore went to the heart of the matter and properly served as a basis for an adverse credibility determination. *See Li v. Ashcroft*, 378 F.3d 959, 962 (9th Cir. 2004). The BIA also based its adverse credibility decision on Oropeza's inconsistent testimony concerning Solis. Because his relationship with Solis was an important factor in determining whether he entered into the marriage with Renteria in good faith, these inconsistencies also went to the heart of his claim and properly served as a basis of the BIA's adverse credibility determination. Therefore, we hold that the BIA did not err with respect to its credibility finding and review the other evidence accordingly.

## 2. Statutory Waiver

Substantial evidence supports the determination that Oropeza did not meet his burden of proving by a preponderance of the evidence that he entered his marriage to Renteria in good faith. To determine the *bona fides* of the marriage, the proper inquiry is whether Oropeza and Renteria intended to establish a life together at the time they were married. *See Bark v. INS*, 511 F.2d 1200, 1201 (9th Cir. 1975). The IJ may look to the actions of the parties after the marriage to the extent that those actions bear on the subjective intent of the parties at the time they were married. *Id.* at 1202. Additional relevant evidence includes, but is not limited to, documentation such as lease agreements, insurance policies, income tax forms, bank accounts, as well as testimony about the courtship and wedding. *Damon*, 360 F.3d at 1088. Neither the IJ nor the BIA may substitute personal conjecture or inference for reliable evidence. *Id.* at 1089.

[11] In this case, in addition to the adverse credibility determination, the BIA based its decision on evidence of inconsistencies in the documentary evidence and the lack of corroborating testimony to support the claim. The BIA noted that Oropeza provided only limited documentation of the short marriage, and that there were unexplained inconsistencies in the documents, including more addresses than residences that Oropeza identified. The lease Oropeza provided was not signed by him or by Renteria, and Oropeza failed to show that he filed several other applications he offered into evidence—for example, for life insurance and for an automobile title. There was little corroborative evidence of Oropeza's version of the events—the only additional evidence being in the form of a letter from a nurse who knew him only as a patient. Although it might be possible to reach a contrary conclusion on the basis of the record, under the substantial evidence standard, the evidence presented here does not compel a finding that Oropeza met his burden of proving that the mar-

riage was entered into in good faith. The BIA therefore did not err in denying Oropeza's statutory waiver.

### 3. Removal for Marriage Fraud

[12] We also deny the petition with respect to the order of removal for marriage fraud. The only argument Oropeza offers concerning his removal is that the BIA erred in denying his application for a statutory waiver on the ground that his marriage was not in good faith. Because we have rejected that argument and because Oropeza does not challenge the BIA's removal order directly, or support his challenge to that order by any separate argument, we deny his petition without further discussion.[10]

## IV. Conclusion

We lack jurisdiction over the denial of the voluntary departure claim but retain jurisdiction over the remainder of the petition. We deny petitioner's remaining claims, including those pertaining to the denial of a statutory waiver and the order of removal for marriage fraud.

Petition **DISMISSED IN PART** and **DENIED IN PART**.

---

[10]We do not address here the higher burden of proof that the government must meet to remove an alien under § 1227(a)(1)(G)(i). *See Nakamoto*, 363 F.3d at 882 (holding that the INS has burden of proving removability by clear, unequivocal, and convincing evidence). We also note that Oropeza was not charged with removability under § 1227(A)(1)(D) for termination of conditional permanent residence.